# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP601 |
| COMPLETE TITLE: | Midwest Neurosciences Associates, LLC and Neurosurgery and Endovascular Associates, SC, Plaintiffs-Appellants, v. Great Lakes Neurosurgical Associates, LLC and Yashdip Pannu, M.D., Defendants-Respondents-Petitioners. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 379 Wis. 2d 766, 909 N.W.2d 209
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | December 19, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 10, 2018 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Ozaukee |
| JUDGE: | Paul V. Malloy |

| JUSTICES: | |
|---|---|
| CONCURRED: | ABRAHAMSON, J. concurs. |
| DISSENTED: | BRADLEY, J. dissents. |
| NOT PARTICIPATING: | DALLET, J. did not participate. |

ATTORNEYS:

For the defendants-respondents-petitioners, there were briefs filed by *Joan M. Huffman*, *Paul R. Erickson*, and *Gutglass*, *Erickson*, *Bonville & Larson*, *S.C.*, Milwaukee. There was an oral argument by *Joan M. Huffman*.

For the plaintiffs-appellants, there was a brief filed by *Frank M. Gumina*, *Patrick M. Harvey*, and *Husch Blackwell LLP*, Milwaukee. There was an oral argument by *Patrick M. Harvey*.

2018 WI 112

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2016AP601
(L.C. No.  2015CV324)

STATE OF WISCONSIN : IN SUPREME COURT

Midwest Neurosciences Associates, LLC and
Neurosurgery and Endovascular Associates, SC,

    Plaintiffs-Appellants,

    v.

Great Lakes Neurosurgical Associates, LLC and
Yashdip Pannu, M.D.,

    Defendants-Respondents-Petitioners.

**FILED**

**DEC 19, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1  ANNETTE KINGSLAND ZIEGLER, J.  This is a review of an unpublished decision of the court of appeals, Midwest Neurosciences Assocs., LLC v. Great Lakes Neurosurgical Assocs., LLC, No. 2016AP601, unpublished slip op. (Wis. Ct. App. Dec. 20, 2017), reversing the Ozaukee County circuit court's[1] non-final order.  The non-final order denied Midwest Neurosciences Associates, LLC ("Midwest") and Neurosurgery and Endovascular

---

[1] The Honorable Paul V. Malloy presided.

Associates S.C.'s ("NEA") motion to stay this action and compel arbitration pursuant to the Amended and Restated Operating Agreement ("Operating Agreement"), as well as the circuit court's granting of Yashdip Pannu, M.D. ("Dr. Pannu") and Great Lakes Neurosurgical Associates, LLC's ("Great Lakes") motion for declaratory judgment seeking a declaration that the Membership Interest Redemption Agreement ("Redemption Agreement") was a valid contract. The court of appeals remanded to the circuit court with instructions to grant Midwest's motion to compel arbitration pursuant to the Operating Agreement. We reverse the court of appeals and remand to the circuit court to determine whether the Redemption Agreement is enforceable.

¶2 The crux of the issue before us concerns the circuit court's role in determining the proper forum of dispute resolution when a subsequent contract, if enforceable, does not contain an arbitration clause as is present in an initial contract. As a part of that analysis we consider whether a contract which contains a merger clause and which does not contain an arbitration clause can change the forum of dispute resolution when a prior agreement between the parties contains an arbitration clause.[2] The parties make competing arguments

---

[2] The parties disagree as to whether the Redemption Agreement was validly formed. The JAMS Arbitration Rules in the Operating Agreement, however, require that even the issue of arbitrability be arbitrated. See infra note 7. "JAMS provides arbitration and mediation services worldwide," including the creation of rules that can be used to govern the arbitration of disputes at the parties' agreement. JAMS Comprehensive Arbitration Rules & Procedures Rule 1, at 1, 6 (July 1, 2014),

(continued)

2

regarding a court's role in determining the applicability of this arbitration provision. They take contrary positions regarding whether all disputes, even arbitrability itself, must be submitted to arbitration. The parties present conflicting views of precedent regarding the judiciary's role in deciding motions to compel arbitration when a subsequent contract does not select arbitration as the forum for dispute resolution and does contain a merger clause which states that the subsequent agreement supersedes all prior contracts. Relatedly, the parties dispute whether all parties here can be compelled to arbitrate when arguably only one co-defendant is contractually required to arbitrate pursuant to the initial contract.

¶3 The claims in the underlying lawsuit that called upon the court to decide whether the dispute belonged in arbitration, involve whether Great Lakes and Dr. Pannu violated restrictive covenants in the Operating Agreement and the Ancillary Restrictive Covenant Agreement ("Ancillary Restrictive Covenant"). The Redemption Agreement, however, does not contain an arbitration provision and in fact, purports to release those restrictive covenants. Therefore, which contract controls is seminal in the first instance as to whether arbitration should be ordered. Ultimately, regardless of forum, the controlling documents will also impact the underlying dispute itself.

---

https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/
JAMS_comprehensive_arbitration_rules-2014.pdf.

¶4 The circuit court concluded on summary judgment that even though the initial agreement, here the Operating Agreement, required arbitration it was superseded by a later, valid and enforceable Redemption Agreement which did not so require the parties to submit to arbitration. The court of appeals reversed and remanded with instructions to grant Midwest's motion to compel arbitration.[3]

¶5 We reverse the court of appeals and conclude that the fundamental principles of freedom to contract allow parties to a previous contract to subsequently contract for a different forum of dispute resolution. Here, it is necessary that the circuit court initially determine whether the parties contracted to arbitrate. The court's authority to order arbitration is dependent on the terms of a contract. If the Redemption Agreement is the parties' contract, then the court lacks authority to order arbitration. Thus, the court must first ascertain which contract controls the forum of dispute resolution. In sum, we conclude that it is a court's duty to determine whether a contract calls for arbitration and when a dispute exists as to whether a second contract without an arbitration clause supersedes a first contract with such a

---

[3] Presiding Judge Reilly concurred, expressing concern that Cirilli v. Country Insurance & Financial Servs., 2009 WI App 167, 322 Wis. 2d 238, 776 N.W.2d 272, and Mortimore v. Merge Technologies Inc., 2012 WI App 109, 344 Wis. 2d 459, 824 N.W.2d 155, erode freedom of contract and prevent parties from subsequently contracting out of arbitration.

clause, the determination of arbitrability must be decided in the first instance by the circuit court rather than the arbitrator.

¶6 We also conclude, however, that the cause must be remanded to the circuit court, not to compel arbitration as was ordered by the court of appeals, but rather, because the parties' competing affidavits submitted in support of their positions on summary judgment raised genuine issues of material fact concerning whether the Redemption Agreement is a valid contract.[4] Therefore, we reverse and remand to the circuit court for further proceedings.

## I. FACTUAL BACKGROUND

¶7 Dr. Pannu was Great Lakes' president, 100 percent owner, and sole practicing physician. Arvind Ahuja, M.D. ("Dr. Ahuja") was the sole Member of Midwest and later the sole Member of NEA. William McCullough, M.D. ("Dr. McCullough") was the sole Member of Metro Neurosurgical, S.C. ("Metro"). In 2015, the three Members of Midwest were NEA, Great Lakes, and Metro. The presidents of each were also practicing neurosurgeons and had offices adjacent to St. Luke's Medical Center in Milwaukee, Wisconsin. The current dispute involves

---

[4] We need not weigh in on the host of issues that might relate to a non-signatory being bound by an arbitration agreement, such as (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference. Zurich Am. Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 687 (7th Cir. 2005).

only Drs. Pannu and Ahuja and the applicability of an arbitration provision from a contract entered into a decade previous.

¶8 Specifically, on August 1, 2005, the parties at issue executed an Operating Agreement which modified a previous operating agreement of August, 2002 so to admit, among others, Dr. Pannu to Midwest.[5] Dr. Pannu executed the Operating Agreement as President of Great Lakes and also signed a personal guaranty for the obligations of Great Lakes. The Operating Agreement contains the arbitration clause at issue.

¶9 The Operating Agreement created rights, obligations, and restrictions for the Members of Midwest and the physicians that worked for the Members. The document includes various other provisions. For example, the Operating Agreement controls how Midwest was to be managed and operated. For instance, subsection 1.2(a) dictates that Midwest shall have a registered office and subsection 5.5(b) grants Midwest's president the power to unilaterally terminate Members.

¶10 Section 8.5 of the Operating Agreement grants Members the right to voluntarily withdraw from Midwest. Under Section 8.5, a Member could withdraw from Midwest by "giving written

---

[5] Midwest's primary purpose was to assist its Members, who employed physicians, in "the operation of their medical practices."

6

notice to [Midwest] at least ninety (90) days before the stated effective date of the withdrawal."[6]

¶11 Section 13.3 dictates that the "Operating Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin without regard to its choice of law provisions."

¶12 Section 13.1 of the Operating Agreement provides:

> Amendments to Operating Agreement. No Amendment or modification of this Operating Agreement shall be valid unless in writing and signed by all of the Members. Unless otherwise provided in such an amendment or modification, this Operating Agreement shall be considered to be amended only to the minimal extent necessary to give effect to this Operating Agreement, and the other terms and conditions of this Operating Agreement shall continue to apply with full force and effect.

¶13 Section 13.7 of the Operating Agreement is entitled "Arbitration," and states, in pertinent part:

> Arbitration. . . . [T]he parties hereto agree to resolve any and all disputes arising with respect to the terms and conditions of this Operating Agreement hereby by arbitration . . . . The arbitration shall be governed by the laws of the State of Wisconsin, this Operating Agreement and JAMS' Arbitration Rules[7] to the extent not inconsistent with the foregoing.

---

[6] The provision of notice under Section 8.5 was subject to the provisions of Section 13.8, which provided that the notice was "valid only if in writing and upon actual receipt by the intended recipient of the notice." This provision factors into the arguments about the Redemption Agreement's enforceability.

[7] JAMS Arbitration Rule 11, "Interpretation of Rules and Jurisdictional Challenges," in relevant part, provides:

> (b) Jurisdictional and arbitrability disputes, including disputes over the formation, existence,

(continued)

7

¶14 Section 8.13 contains a "Covenant Not to Compete," which details, among other things, a restriction that the doctors practice in their specialty for a designated period of time, in a specified area, and at particular facilities.[8] On March 6, 2006, Dr. Pannu personally signed the Ancillary Restrictive Covenant containing similar terms to Section 8.13 of the Operating Agreement. The Ancillary Restrictive Covenant, however, did not specifically incorporate by reference Section 13.7, the arbitration section, of the Operating Agreement.

¶15 Nearly ten years later, in 2015, Great Lakes and NEA were two of three remaining Members of Midwest. On February 13, 2015, the Members unanimously voted to dissolve Midwest as of March 31, 2015. One doctor relocated out of state and is not part of this lawsuit.[9] Dr. Ahuja, who had no hospital privileges in the Milwaukee area, had previously announced his intention to vacate his practice from the offices.

---

validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Comprehensive Arbitration Rules & Procedures Rule 11(b), supra note 2, at 14.

[8] The underlying litigation in this case claims that Great Lakes and Dr. Pannu violated non-compete restrictive covenants.

[9] Dr. McCullough moved to Texas and vacated the offices.

¶16 On March 16, 2015, the Members restructured the dissolution process such that NEA would buy out the Members' interests in Midwest. Great Lakes would vacate the premises no later than May 15, 2015. Great Lakes, however, was subject to the non-compete provisions of the Operating Agreement. After discussing the logistics of how the purchases would work, the Members unanimously voted to rescind the vote to dissolve Midwest.[10]

¶17 On March 30, 2015, Midwest's attorney sent an e-mail to Dr. Pannu, Dr. Ahuja, and Great Lakes' and Midwest's accountants attaching a "proposed [Redemption Agreement] and [an] Assignment Agreement" which concerned, in part, the release of the non-compete provision with Midwest. The recipients of the e-mail were instructed to ask any questions at their "earliest opportunity" because "we intend to exchange funds and sign documents tomorrow." On March 31, 2015, in response to a suggestion from Great Lakes' accountant, Midwest's attorney added one paragraph to the Redemption Agreement and confirmed

---

[10] NEA's offer to buy the other Members' interests came in response to the Members being advised that there were unforeseen difficulties with winding down Midwest related to expenses and lease obligations. Prior to voting, the Members had a lengthy discussion regarding retirement plans and lease obligations. With respect to the retirement plans, it was determined that actuarial calculations would be done to determine how much Dr. Pannu and Dr. McCullough would pay. In addition, it was agreed that Midwest's accountant would calculate the projected wind-down expense budget for Midwest and that Dr. Pannu and Dr. McCullough would pay their projected wind-down expenses based on that budget.

that his assistant had sent the "the final agreement." The e-mail also contained the following instructions: "Please sign and deliver per my earlier email."[11]

¶18 On the same day, Dr. Pannu executed the Redemption Agreement and the accompanying Assignment Agreement[12] and delivered them to Midwest's attorney. The Redemption Agreement distinguishes Great Lakes from Dr. Pannu as "Pannu" and "Y. Pannu," respectively, and also notes that it is Great Lakes, "Pannu", that holds a one-third membership interest in Midwest.

¶19 The Redemption Agreement outlines Great Lakes and Midwest's desire to "set forth the terms upon which [Great Lakes] will sell and [Midwest] will redeem [Great Lakes'] entire Membership Interest" in Midwest. For instance, the Redemption Agreement indicates that Great Lakes "desires to voluntarily surrender [Great Lakes'] membership in [Midwest] effective March 31, 2015, pursuant to Section 8.5 of the Operating

---

[11] Great Lakes and Dr. Pannu assert that Midwest's attorney was acting as both Midwest's and NEA's attorney when he circulated the Redemption Agreement. They allege that this does not create a conflict of interest because Dr. Ahuja cannot approve the transaction with respect to Midwest, while rejecting the same transaction with respect to NEA. Midwest and NEA, however, allege that if Midwest's attorney "was representing Midwest, he could not also represent NEA" because Great Lakes was still a Member of Midwest. It is not necessary for us to answer this disagreement.

[12] The Assignment Agreement states that, as of March 31, 2015, Great Lakes "transfer[red] and assign[ed] to [Midwest] . . . all of [Great Lakes'] right, title and interest in and to the Membership Interests."

Agreement," and Section 2 of the Redemption Agreement dictates that Great Lakes "shall sell, assign and transfer to [Midwest], free and clear of all liens, claims, agreements and encumbrances, and [Midwest] shall purchase and acquire from [Great Lakes], the entire Membership Interest." The Redemption Agreement outlines the purchase price for Great Lakes' membership interest and specifically identified and allocated to Great Lakes the amount that it was required to pay to Midwest for its share of the costs associated with winding down Midwest, as well as requiring Great Lakes to pay a set amount relating to retirement plans. The Redemption Agreement also establishes that Great Lakes must "fully vacate" its office suite by April 30, 2015.

¶20 Section 6 of the Redemption Agreement is entitled, "Mutual Release," and provides:

> [Midwest] Releasees [, defined as "[Midwest] and each of [Midwest's] Members and the Members' shareholders, members, owners, successors, assigns, agents, directors, officers, employees, representatives, attorneys, heirs, executors and administrators of such of the foregoing as are natural persons, and all persons acting by, through, under or in concert with any of the foregoing,] hereby jointly and severally, irrevocably and unconditionally release, acquit and forever discharge [Great Lakes and Dr. Pannu] and each of [Great Lakes'] shareholders, members, owners, successors, assigns, agents, directors, officers, employees, representatives, attorneys, heirs, executors and administrators of such of the foregoing as are natural persons, and all persons acting by, through, under or in concert with any of the foregoing (collectively, "Pannu Releasees"), or any of them, from any and all Claims[, defined as charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions,

11

causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), known and unknown, of any nature whatsoever, including without limitation, any and all claims under the Expense Sharing Agreement, the Operating Agreement, and any and all other claims, whether at common law, in contract or tort,] which [Midwest] Releasees now have or claim to have or which [Midwest] Releasees at any time heretofore had or claimed to have or which [Midwest] Releasees at any time hereafter may have or claim to have for any claims arising or accruing to the date hereof against each or any of the Pannu Releasees, other than for a breach of this Agreement. (Emphases added.)

¶21 Section 7 of the Redemption Agreement, "Release of Non-Compete Restrictions," states: "[Great Lakes and Dr. Pannu] are currently subject to non-compete restrictions contained in the Operating Agreement and in the [Ancillary Restrictive Covenant]. In consideration for the terms of this Agreement, [Great Lakes and Dr. Pannu's] restrictions against competition are hereby released and made void."

¶22 Section 10.3 of the Redemption Agreement, "Applicable Law," does not reference arbitration, nor does an arbitration clause exist elsewhere in the Redemption Agreement. Section 10.3 reads: "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Wisconsin."

¶23 According to Dr. Pannu's affidavit, he and Great Lakes had performed all of their obligations under the Redemption Agreement other than moving out of their office by April 8,

12

2015. For instance, Dr. Pannu said he delivered a check for Great Lakes' share of the wind-down expenses to Midwest's attorney and hand-delivered a check for Great Lakes' retirement plan contributions to Midwest's accounting firm. It is undisputed that one of Great Lakes' checks was cashed.[13]

¶24 On April 8, 2015, Dr. Pannu attempted to get a copy of the Redemption Agreement as signed by Dr. Ahuja. Initially, Dr. Pannu exchanged text messages with Dr. Ahuja:

| | |
|---|---|
| Dr. Pannu: | Hi<br>Can u get me a copy of the<br>[Redemption Agreement] signed by you<br>Thx |
| Dr. Ahuja: | Will work on it when I am back<br>? Anything up |
| Dr. Pannu: | No<br>Attorney wants it<br>So it is clean |
| Dr. Ahuja: | Yea and it appears not going to<br>let us out of lease<br>But I will take care of it |
| Dr. Pannu: | Ok |
| Dr. Ahuja: | ? Who is your lawyer thx |
| Dr. Pannu: | [Lawyer's name][14] |

---

[13] According to Dr. Ahuja's affidavit, the check was cashed in error by a clerical employee and a cashier's check in the same amount was sent to Dr. Pannu once the error was discovered.

[14] The attorney that Dr. Pannu named clarified on the record at a motion hearing on December 17, 2015, that he "was not involved in this" prior to April 8, 2015, and had not been "copied on anything . . . prior to that."

Dr. Ahuja:    K great

¶25 Further, within ten minutes of sending the initial text message, Dr. Pannu sent an e-mail to Midwest's attorney, and carbon copied Dr. Ahuja and Midwest's and Great Lakes' accountants, asking Midwest's attorney to "let [him] know when you get a signed copy of the agreement from [Dr. Ahuja]." Midwest's attorney responded that he would meet with Dr. Ahuja to get his signature "[a]s soon as all of the documentation is accounted for."[15]

¶26 According to Dr. Ahuja's affidavit, he (and thus Midwest and NEA) never agreed to the terms of the Redemption Agreement.  Initially, Dr. Ahuja said he never instructed Midwest's attorney to include a complete release of Great Lakes' or Dr. Pannu's non-compete obligations in the Redemption Agreement and that Dr. Ahuja in fact disagreed with releasing the restrictions.  Further, Dr. Ahuja stated that during an April 20, 2015 phone call with Dr. Pannu, he told Dr. Pannu that he was still reviewing the Redemption Agreement.  Moreover, Dr. Ahuja stated that once he had more thoroughly reviewed the Redemption Agreement, he determined he was not willing to sign it.

---

[15] In the e-mail, Midwest's attorney stated that they were waiting on retirement plan documents from Great Lakes. According to Dr. Pannu's affidavit, Great Lakes and Dr. Pannu had already provided the requested documents to Midwest's accountant.

¶27 On April 30, 2015, Great Lakes vacated the office and moved into different office space in the same facility that was shared with a physician unaffiliated with Midwest.[16]

¶28 In May of 2015, Great Lakes and Dr. Pannu were advised that Midwest and NEA considered the Redemption Agreement to be a mere proposal that was subsequently rejected by Midwest and NEA. Thus, Midwest and NEA alleged that Great Lakes and Dr. Pannu were violating the non-compete covenants in the Operating Agreement and the Ancillary Restrictive Covenant.

¶29 On July 1, 2015, Dr. Ahuja, on behalf of Midwest, sent a letter to Dr. Pannu informing him that Great Lakes' membership status in Midwest was being terminated effective immediately pursuant to Section 5.5(b) of the Operating Agreement. The letter also demanded that Great Lakes and Dr. Pannu comply with the non-compete restrictions in the Operating Agreement and the Ancillary Restrictive Covenant.

## II. PROCEDURAL POSTURE

¶30 On September 2, 2015, Midwest and NEA filed a complaint against Great Lakes and Dr. Pannu alleging that Great Lakes and Dr. Pannu breached the non-compete covenants of the

---

[16] Great Lakes and Dr. Pannu subsequently moved back into their old office that was shared with Midwest from June of 2015 to January of 2016, but moved out once more in January of 2016.

15

2005 Operating Agreement and the 2006 Ancillary Restrictive Covenant.[17]

¶31 Before a responsive pleading was filed, Midwest and NEA moved to stay the proceedings and compel arbitration in accordance with Section 13.7 of the Operating Agreement. Midwest and NEA argued that the Operating Agreement was the governing contract between the parties and that Section 13.7 within that agreement unambiguously required the parties to arbitrate violations of Section 8.13 of the Operating Agreement and the Ancillary Restrictive Covenant. Midwest and NEA argued that the Operating Agreement governed because there was never a meeting of the minds on the Redemption Agreement, as well as the fact that the Redemption Agreement was never signed by all of the parties which was required to amend the Operating Agreement per Section 13.1. Further, Midwest and NEA argued that any challenge to the validity of the Operating Agreement must be decided by an arbitrator, not the circuit court.

¶32 On October 6, 2015, Great Lakes and Dr. Pannu filed an answer containing affirmative defenses and counterclaims,[18] as

_____

[17] On February 29, 2016, Midwest and NEA filed an amended complaint, reiterating the causes of action in the initial complaint and pleading additional causes of action against Great Lakes and Dr. Pannu related to Great Lakes and Dr. Pannu's payment of rent to Midwest, as well as Great Lakes and Dr. Pannu's alleged tortious interference with Midwest and NEA's prospective and current contractual relationships.

[18] On February 29, 2016, Great Lakes and Dr. Pannu filed an amended counterclaim. On April 15, 2016, Great Lakes and Dr. Pannu filed an amended answer containing affirmative defenses and counterclaims.

well as a motion for declaratory judgment seeking, among other things, an order declaring that the Redemption Agreement was a valid contract. They contended that as of March 31, 2015, the Operating Agreement and the non-compete provisions of the Ancillary Restrictive Covenant were invalid, unenforceable, and/or inapplicable to Great Lakes and Dr. Pannu. Great Lakes and Dr. Pannu argued that the Redemption Agreement is binding and released them from the non-compete restrictions in the Operating Agreement and the Ancillary Restrictive Covenant. They argued that the Redemption Agreement was binding because Midwest and NEA manifested their intention to sign the Redemption Agreement and reaffirmed their intention by allowing Great Lakes and Dr. Pannu to fully perform the obligations therein. Accordingly, the motion further sought an order declaring that Midwest and NEA are not entitled to arbitration. In subsequent responses, Great Lakes and Dr. Pannu argued that the circuit court must decide whether the Redemption Agreement is enforceable and that, at best, it is premature to compel arbitration because the merits of the case hinge entirely on the enforceability of the Redemption Agreement, which contains no arbitration clause and in fact, fully releases them from the claims asserted. The parties filed briefs and affidavits in support of their respective positions.

¶33 On December 17, 2015, the circuit court held a hearing on both motions. Initially, the circuit court stated that the motion for declaratory judgment was "similar to a summary judgment motion" and that "maybe there[ are] some" factual

17

disputes. Nonetheless, the court found that Dr. Ahuja, through Midwest's attorney, made an offer that he intended to be bound by when the e-mail containing the "final agreement" was sent. Further, the circuit court noted that Dr. Pannu accepted the offer when he signed the Redemption Agreement and returned it with the check that was subsequently cashed. Moreover, the circuit court held that the "minor problems" after March 31, 2015, or Dr. Ahuja's "ambiguous" text message to Dr. Pannu on April 8, 2015, that a reasonable person could view as saying "I'm questioning the agreement," do not change the analysis because the Redemption Agreement was already a "done deal" and the "horse was kind of out of the barn and you can't put it back." The circuit court granted Great Lakes and Dr. Pannu's motion and concluded that the Redemption Agreement was an enforceable contract and thus, that Great Lakes and Dr. Pannu were not restricted by the covenants not to compete in either the Operating Agreement or the Ancillary Restrictive Covenant.

¶34 On March 16, 2016, the circuit court issued a written order granting Great Lakes and Dr. Pannu's motion and declaring that the Redemption Agreement was a valid contract. The court determined that as of March 31, 2015, the Operating Agreement and the non-compete provisions of the Ancillary Restrictive Covenant were invalid, unenforceable and/or inapplicable to Great Lakes and Dr. Pannu. The order also denied Midwest and NEA's motion to stay the action and compel arbitration.

¶35 On March 23, 2016, Midwest and NEA petitioned for leave to appeal the circuit court's March 16 order, which the

18

court of appeals granted. On December 20, 2017, the court of appeals issued its decision concluding that the "determinative question is whether the circuit court erred by not ordering the parties to submit their dispute to arbitration." Midwest Neurosciences, No. 2016AP601, ¶8. The court of appeals held "that the question of whether the arbitration clause was superseded should have been submitted to arbitration." Id., ¶2. As such, the court of appeals declined to address the multiple other issues that Midwest and NEA raised on appeal and reversed and remanded, instructing the circuit court to grant Midwest and NEA's motion to compel arbitration. Id., ¶¶2, 8, 23.

¶36 On February 5, 2018, Great Lakes and Dr. Pannu petitioned this court for review. On May 18, 2018, we granted the petition. We now reverse and remand the cause for further proceedings consistent with this opinion.

### III. STANDARD OF REVIEW

¶37 This case comes to us on summary judgment.[19] "We review summary judgment rulings independently, applying the

---

[19] The circuit court understood Great Lakes and Dr. Pannu's motion for declaratory judgment to be "similar to a summary judgment motion" and applied the summary judgment methodology. Thus, while the motion was entitled a motion for declaratory judgment, it was actually a motion for summary judgment. See WEA Prop. & Cas. Ins. Co. v. Krisik, 2013 WI App 139, ¶¶1, 4 n.2, 8, 352 Wis. 2d 73, 841 N.W.2d 290 (reviewing a motion for declaratory judgment as a summary judgment motion because the circuit court understood the motion to "in essence [] be a motion for summary judgment and applied the summary judgment methodology").

19

well-established standards set forth in Wis. Stat. § 802.08 [(2015-16)]."[20] <u>Hirschhorn v. Auto-Owners Ins. Co.</u>, 2012 WI 20, ¶20, 338 Wis. 2d 761, 809 N.W.2d 2d 529. Thus, we independently review whether the circuit court correctly granted summary judgment to Great Lakes and Dr. Pannu. <u>Tatera v. FMC Corp.</u>, 2010 WI 90, ¶15, 328 Wis. 2d 320, 786 N.W.2d 810 (citing <u>Racine Cty. v. Oracular Milwaukee, Inc.</u>, 2010 WI 25, ¶24, 323 Wis. 2d 682, 781 N.W.2d 88). Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Id.</u>; § 802.08(2).

¶38 "[A] petition to compel arbitration involves contract interpretation, which is a question of law that we review de novo." <u>First Weber Grp., Inc. v. Synergy Real Estate Grp., LLC</u>, 2015 WI 34, ¶20, 361 Wis. 2d 496, 860 N.W.2d 498. Thus, "determination[s] of substantive arbitrability . . . [are] questions of law we review de novo." <u>Cirilli v. Country Ins. & Fin. Servs.</u>, 2009 WI App 167, ¶10, 322 Wis. 2d 238, 776 N.W.2d 272. Similarly, issues of contract interpretation are reviewed de novo. <u>Mortimore v. Merge Technologies Inc.</u>, 2012 WI App 109, ¶13, 344 Wis. 2d 459, 824 N.W.2d 155.

---

[20] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

## IV. ANALYSIS

### A. Fundamental Principles

#### 1. Freedom to contract and laws governing arbitration

¶39 "Freedom of contract is based on the idea that individuals should have the power to govern their own affairs without interference." Solowicz v. Forward Geneva Nat'l, LLC, 2010 WI 20, ¶34, 323 Wis. 2d 556, 780 N.W.2d 111. As such, "if there is one thing which more than another public policy requires it is that [individuals] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice." Merten v. Nathan, 108 Wis. 2d 205, 212 n.5, 321 N.W.2d 173 (1982) (quoting Balt. & Ohio Sw. Ry. Co. v. Voigt, 176 U.S. 498, 505 (1900)). Thus, Wisconsin courts have generally sought "to enforce contracts deliberately made by the parties rather than set them aside." Baierl v. McTaggart, 2001 WI 107, ¶12, 245 Wis. 2d 632, 629 N.W.2d 277.

¶40 Arbitration agreements are "a matter of contract." Joint Sch. Dist. No. 10 v. Jefferson Educ. Ass'n, 78 Wis. 2d 94, 101, 253 N.W.2d 536 (1977) (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)); First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995). As such, "[a]rbitrators derive their authority only from the parties' advance agreement that they will submit such grievances to arbitration" and thus, parties cannot be "required to submit any dispute to arbitration unless [they have] agreed to do so."

21

Kimberly Area Sch. Dist. v. Zdanovec, 222 Wis. 2d 27, 39, 586 N.W.2d 41 (Ct. App. 1998) (citing AT&T Technologies, Inc. v. Commc'ns Workers of America, 475 U.S. 643, 648-49 (1986)). Parties may contract broadly and agree to arbitrate, even the issue of arbitrability. Mortimore, 344 Wis. 2d 459, ¶¶15, 20.

¶41 Wisconsin law recognizes the need to defer to the parties' agreement to arbitrate and the "policy of encouraging arbitration as an alternative to litigation." First Weber Grp., 361 Wis. 2d 496, ¶24. When parties agree to arbitration, a court's role is limited because a different forum of dispute resolution has been selected. In fact, the Wisconsin legislature has codified the limited role of the court. See Wis. Stat. ch. 788. In Mortimore, the court of appeals explained that when the parties have contracted to arbitrate, the court's "function is limited to a determination of whether: (1) there is a construction of the arbitration clause that would cover the grievance on its face and (2) whether any other provision of the contract specifically excludes it." Mortimore, 344 Wis. 2d 459, ¶16.

¶42 Wisconsin's "policy of encouraging arbitration as an alternative to litigation," see First Weber Grp., 361 Wis. 2d 496, ¶24, however, is not limitless. Even Midwest acknowledges that courts typically decide the initial issue of arbitrability. "[A]rbitrators cannot determine whether they have the authority to decide arbitrability unless the parties give arbitrators such authority." Kimberly Area Sch. Dist., 222 Wis. 2d at 39-40; see generally Joint Sch. Dist. No. 10, 78

22

Wis. 2d at 110 (stating that "parties may submit arbitrability to an arbitrator"). "[T]he evidence of this grant [of authority] must be 'clear and unmistakable,'" otherwise, "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." Kimberly Area Sch. Dist., 222 Wis. 2d at 39-40; see also Kaplan, 514 U.S. at 944-45 ("silence or ambiguity" affects the presumption of arbitrability).

¶43 Consequently, only those disputes that the parties have agreed to so submit to arbitration are relegated to proceed in that forum. Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010). A court should order arbitration "only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." Id. at 299; id. at 300 (stating all of the United States Supreme Court's opinions compelling arbitration did so only "after the Court was persuaded that the parties' arbitration agreement was validly formed and that it covered the dispute in question and was legally enforceable").

¶44 In Granite Rock Co., the Court clarified that "[t]he test for arbitrability remains whether the parties consented to arbitrate the dispute in question." Id. at 304 n.11. Thus, in Granite Rock Co., the Court concluded that judicial resolution was required "to determine whether the parties consented to arbitrate the matters covered by the [arbitration] demand." Id.

23

at 303 n.9 & 304 (referencing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 n.1 (2006)). This rule stems from the "principle that underscores all of our arbitration decisions: Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes——but only those disputes——that the parties have agreed to submit to arbitration.'" Id. at 299 (citation omitted).

¶45 In answering both who determines arbitrability and what is subject to arbitration, Wisconsin courts apply state-law contract principles and chapter 788. Kaplan, 514 U.S. at 944. Utilization of the Wisconsin contract principles requires "courts to place arbitration agreements 'on equal footing with all other contracts.'" Kindred Nursing Ctrs. Ltd. P'ship v. Clark, 581 U.S. ___, 137 S. Ct. 1421, 1424, 1426 (2017). Accordingly, "[a] court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" Id. at 1426.

¶46 Chapter 788 of the Wisconsin Statutes is also referred to as the "Wisconsin Arbitration Act" and limits a court's role with respect to issues concerning arbitration. A court, however, must still, when called upon to do so, determine in the first instance whether the parties agreed to arbitrate. Then it becomes a court's duty to determine whether a contract calls for arbitration and when a dispute exists as to whether a second contract without an arbitration clause supersedes a first

24

contract with such a clause, the determination of arbitrability must be decided in the first instance by the circuit court rather than the arbitrator.

¶47 Wisconsin Stat. § 788.01, entitled "Arbitration clauses in contracts enforceable," provides that a written arbitration agreement "shall be valid, irrevocable and enforceable <u>except upon such grounds as exist at law or in equity for the revocation of any contract</u>" (emphasis added). As a result, it is a court's duty to determine whether a contract calls for arbitration. Another contract that clearly and expressly supersedes a first contract is "grounds as exist at law or in equity for the revocation of a contract."

¶48 Wisconsin Stat. § 788.02 informs when a court must stay proceedings to permit arbitration, as follows:

> If any suit or proceeding be brought upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Section 788.03 directs how a court ordering arbitration is to proceed and states in part as follows:

> The party aggrieved by the alleged failure, neglect or refusal of another to perform under a written agreement for arbitration may petition any court of record having jurisdiction of the parties or of the property for an order directing that such arbitration proceed as provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied

25

> that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

Wis. Stat. § 788.03.

¶49 The court may, after arbitration, vacate an arbitrator's award or order a rehearing by the arbitrator, pursuant to Wis. Stat. § 788.10. In addition, the court may, after arbitration, modify an arbitrator's award pursuant to Wis. Stat. § 788.11. Finally, pursuant to Wis. Stat. § 788.12, a circuit court may enter judgment "[u]pon the granting of an order confirming, modifying or correcting an award," in conformity therewith.

¶50 Thus, when parties have contracted for arbitration as the forum for dispute resolution, a court's role is limited. In this case, however, the court must first ascertain whether the controlling contract calls for arbitration. Thus, we are presented with the question of the court's role when the parties once contracted to arbitrate, but the court is presented with a later written contract that does not contain an arbitration clause. Fundamental principles clearly militate in favor of the ability to freely contract, even if that changes the forum of dispute resolution. Which contract controls is seminal to a determination of whether arbitration must be ordered.

### 2. The contracts at issue

¶51 The contracts at issue require closer examination because whether the parties entered into the later contract

26

controls initially the court's determination regarding the proper forum of dispute resolution, but also later may impact the underlying dispute. If the Redemption Agreement is enforceable, its terms do not choose arbitration as the forum for dispute resolution. If it is not, the matter must proceed according to the Operating Agreement and the Ancillary Restrictive Covenant. Thus, it is the court that must first determine whether a valid contract requires arbitration. The dispute regarding the Redemption Agreement presents "such grounds as exist at law or in equity for the revocation of" the Operating Agreement and Ancillary Restrictive Covenant. Wis. Stat. § 788.01. Before an action can be stayed to permit arbitration, the court must be "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." Wis. Stat. § 788.02. Before the court can order arbitration, the court must be "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Wis. Stat. § 788.03.

¶52 Initially in 2005, the parties entered into an Operating Agreement which "memorialize[d] certain amendments and modifications to the Operating Agreement of [Midwest] dated August 1, 2002." This Operating Agreement changed the 2002 contract to admit new Members but it clearly provided for arbitration in Section 13.7. The Operating Agreement contained a restrictive covenant between Great Lakes and Midwest in Section 8.13. Dr. Pannu and Midwest separately entered into an Ancillary Restrictive Covenant a year later. Then about ten

27

years later, in 2015, the dynamic and composition of the group changed and the parties purportedly entered into a Redemption Agreement, which contains a mutual release and indemnification as a part of winding down the business, provides for the surrender of Great Lakes and Dr. Pannu's membership in Midwest, and releases Great Lakes and Dr. Pannu from the 2005 and 2006 restrictive covenants. The Redemption Agreement specifically supersedes "all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written" in its merger clause.

¶53 A determination as to whether the issue of arbitrability is to be submitted to the arbitrator is examined in light of the pertinent contract. In order to determine whether the parties have always and forever agreed to arbitrate arbitrability by virtue of the JAMS Arbitration Rules in the Operating Agreement from 2005, as the court of appeals concluded, we must further examine the language of the contracts. "[N]o party can be compelled to arbitrate a matter which he or she has not agreed to submit to arbitration." Mortimore, 344 Wis. 2d 459, ¶15 (citing Cirilli, 322 Wis. 2d 238, ¶12); see also Wis. Stat. ch. 788.

¶54 While a court's role is limited, courts are indeed called upon to determine whether a contract calls for arbitration. Wis. Stat. §§ 788.01, 788.02, 788.03. Only then, if the forum chosen by the contract is arbitration, will the presumption of arbitrability control the dispute. Granite Rock Co., 561 U.S. at 301. Here, serious questions exist as to

28

whether the Operating Agreement still controls the issue of arbitrability, whether the Redemption Agreement supersedes that agreement, and to what extent, if any, one co-defendant, Dr. Pannu individually, ever agreed to arbitrate.

¶55 We now turn to the relevant contracts at issue. Dr. Pannu signed the 2005 Operating Agreement as President of Great Lakes, not individually. While the Operating Agreement contains a guaranty signed by Dr. Pannu, it is separate from the signature page of the Operating Agreement where he signed as President. The guaranty and acknowledgement serve to guaranty the obligations of the signator to the contract, Great Lakes. If the parties were only contesting the requirement to arbitrate under the Operating Agreement alone, the court's role would perhaps be different. See Wis. Stats. ch. 788. That, however, is not the question with which we are presented.

¶56 The parties demonstrated a willingness to later contract in 2006 concerning the individual restrictive covenant, outlined in the Ancillary Restrictive Covenant, which Dr. Pannu signed individually as a physician. The Ancillary Restrictive Covenant does not specifically contain an arbitration clause. Why a subsequent restrictive agreement was necessary in 2006 might be an additional consideration for the court if these were the only two agreements at issue. This is not critical to our analysis, however, because the circuit court must first determine whether the Redemption Agreement is the parties' contract. The Redemption Agreement from a decade later is the only of the three documents at issue that sets forth by its

29

terms the distinct contractual obligations of Great Lakes the entity, and Dr. Pannu individually. The Redemption Agreement does not contain an arbitration provision and by its terms supersedes prior contracts and releases Great Lakes and Dr. Pannu from the non-compete restrictions. These conflicting written contractual provisions militate against the presumption of arbitrating arbitrability. The court is required by chapter 788 of the Wisconsin Statutes to determine whether the contract calls for arbitration. In order to do so, it must determine which is the controlling contract.

¶57 A closer examination of the terms of the contracts further explains why it cannot be assumed that the Operating Agreement alone ends the analysis as to arbitration. Most typically, a challenge might be made to a contractual clause, but the court nonetheless orders even that issue to arbitration because the pertinent contract calls for arbitration. Here, the language of the relevant documents call into question which of the contracts controls.

¶58 The combination of the merger clause in Section 10.2 of the Redemption Agreement, the explicit reference to the Operating Agreement in the "Mutual Release" in Section 6, the "Applicable Law" provision in Section 10.3, and the non-existence of an arbitration provision in the Redemption Agreement, make evident that, if enforceable, the parties did not consent to arbitration in the Redemption Agreement. If the Redemption Agreement revokes the Operating Agreement, the court would not order arbitration pursuant to the Operating Agreement.

¶59 Section 10.2 utilizes different capitalization to denote "this Agreement" (referring to the Redemption Agreement) and "the entire agreement," calling into question whether Midwest, Great Lakes, and Dr. Pannu intended the Redemption Agreement to revoke the Operating Agreement.  The Redemption Agreement, unlike the Operating Agreement or the Ancillary Restrictive Covenant, addresses the relationship between all three.

¶60 For example, the merger clause in Section 10.2 states that "[t]his Agreement" (meaning the Redemption Agreement) constitutes the "entire agreement" between the "parties" (meaning Great Lakes, Dr. Pannu, and Midwest)[21] "pertaining to its subject matter" and that it "supersedes all prior agreements, promises, covenants, arrangements, communications, representations, or warranties, whether oral or written, by [Great Lakes] or [Midwest]."  It "expressly negatives collateral or antecedent understandings."  See Town Bank v. City Real Estate Dev., LLC, 2010 WI 134, ¶39, 330 Wis. 2d 340, 793 N.W.2d 476 (defining a merger clause as a "written provision which expressly negatives collateral or antecedent understandings").  No reference is made to the Arbitration section of the Operating Agreement.

---

[21] Dr. Ahuja was only designated as a party "for purposes of the Mutual Releases and Indemnification set forth in Sections 6 and 8," not Section 10.2.

¶61 Furthermore, Section 6 of the Redemption Agreement by its terms is to "release, acquit and forever discharge" Great Lakes and Dr. Pannu from "any and all" "charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses" of "any nature whatsoever" under "the Operating Agreement." The obligation or promise to "resolve any and all disputes arising with respect to the terms and conditions of this Operating Agreement . . . by arbitration" seemingly fits within this release. See Town Bank, 330 Wis. 2d 340, ¶46 (refusing to require contract drafters to "expressly identify and exclude in their contracts any prior oral or written communication between the parties that may rise to the level of an agreement").

¶62 In addition, the "Applicable Law" provisions in each of the agreements are different. The Operating Agreement's "Applicable Law" provision provides that the "Operating Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin without regard to its choice of law provisions." The arbitration clause in the Operating Agreement specifically incorporates the JAMS Arbitration Rules which state that "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator" (emphases added). JAMS Comprehensive Arbitration Rules & Procedures, Rule 11(b), 14 (July 1, 2014),

32

https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_
comprehensive_arbitration_rules-2014.pdf.

¶63 The Applicable Law section in the Redemption Agreement, on the other hand, is quite different. It contains no arbitration clause and states that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Wisconsin" (emphases added). Simply stated, the applicable law and forum selection in one contract is very different from the other.

¶64 Therefore, the Redemption Agreement, if enforceable, supersedes by its very language the Operating Agreement's mode of adjudication, including its incorporation of JAMS Arbitration Rules that granted the authority to the arbitrator to determine arbitrability. See Thomas W. Ward & Assoc., Inc. v. Spinks, 574 So. 2d 169, 170 (Fla. Dist. Ct. App. 1990) (per curiam) (holding "the trial court cannot leave it to the arbitrators themselves to determine which claims are subject to arbitration when it has not established which agreement applies").

¶65 Due to the foregoing, Midwest and NEA failed to demonstrate "clear and unmistakable" intent to arbitrate. Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 780-81 (10th Cir. 1998). Thus, the question of whether the parties agreed to arbitrate must, in this instance, be decided by the circuit court. See Wis. Stat. ch. 788; see also Riley Mfg. Co., 157 F.3d at 780-81 (holding "the existence of the merger clause

33

in the Settlement Agreement [in combination with the lack of arbitration clause] raises at least an ambiguity on the question of the intent of the parties to allow an arbitrator to decide the validity of the 1991 arbitration clause" because it "raises legitimate questions as to the continuing existence and scope of the arbitration clause in the Manufacturing Agreement" and thus, "the question of whether an agreement to arbitrate continues to exist . . . is a question for the courts").

¶66 Consequently, this matter requires a judicial determination of "whether the parties consented to arbitrate the matters covered by the [arbitration] demand." Granite Rock Co., 561 U.S. at 303 n.9 & 304 (referencing Buckeye Check Cashing, 546 U.S. at 444 n.1).  As will later be discussed, it is for the circuit court to further explore the validity and enforceability of the Redemption Agreement.

### 3.  Clarifying precedents

¶67 No Wisconsin or federal case establishes that once arbitration is contracted as the forum for dispute resolution, parties can never later contract for an alternative forum for dispute resolution.  To the extent Cirilli, 322 Wis. 2d 238, and Mortimore, 344 Wis. 2d 459, are read as concluding that a contract to arbitrate is irrevocable, that interpretation is inconsistent with the law.  Clearly, section 788.01 of the Wisconsin Arbitration Act contemplates that a court will enforce "[a] provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract" and that

34

such contractual provision to arbitrate "shall be valid, irrevocable and enforceable <u>except upon such grounds as exist at law or in equity for the revocation of a contract</u>." Wis. Stat. § 788.01 (emphasis added). Another contract that clearly and expressly supersedes a first contract is "grounds as exist at law or in equity for the revocation of a contract." Thus, <u>Cirilli</u> and <u>Mortimore</u> must not stand for the proposition that once parties contract for arbitration, that decision is always irrevocable.

¶68 Midwest and NEA rely on <u>Cirilli</u> for the proposition that whether a subsequent agreement revokes the consent to arbitrate found in an earlier agreement is for an arbitrator to decide because it goes to the merits of the dispute. This, however, construes <u>Cirilli</u> too broadly.

¶69 <u>Cirilli</u>, unlike this case, did not involve the same parties entering into a subsequent contract. 322 Wis. 2d 238, ¶¶5, 8 n.2, 8-9, 15 n.6. Instead, in <u>Cirilli</u>, the plaintiffs claimed that a subsequent settlement the defendants reached with different parties released them from their duty to arbitrate under their original contract. <u>Id.</u>, ¶¶1-2. <u>Cirilli</u> says nothing about whether parties can enter into a subsequent, superseding contract and agree to remove their disputes from arbitration. Moreover, <u>Cirilli</u> neither addresses nor concludes that there can never be "grounds as exist at law or in equity for the revocation of a contract." In the case at issue, unlike <u>Cirilli</u>, there is a dispute as to whether a second contract without an arbitration clause supersedes the first contract with

35

such a clause. As a result, unlike Cirilli, the determination of arbitrability, whether the Operating Agreement is an unrevoked contract, must be decided, in the first instance, by the circuit court rather than the arbitrator.

¶70 Midwest and NEA also assert that Mortimore, a case where the court of appeals remanded the matter for arbitration, lends further support for their cause. See 344 Wis. 2d 459, ¶1. Midwest and NEA claim that there is no fundamental difference between the oral agreement in Mortimore and the Redemption Agreement here, because neither was fully executed. At a minimum, Midwest and NEA seemingly acknowledge, however, that there is a material factual dispute in both cases upon whether there was a binding subsequent agreement.

¶71 In Mortimore, Mortimore's written employment contract (entered in 2004) contained an arbitration clause and prohibited oral modifications of the contract. Id., ¶3. Specifically, the contract stated that "[n]o amendment or modification of this Agreement shall be: valid or binding upon [Merge Technologies] unless made in writing and signed by an officer of [Merge Technologies] . . . or upon the Executive unless made in writing and signed by him." Id. In 2006 Merge Technologies and Mortimore began working towards drafting a new written contract for Mortimore. Id., ¶7. As of June 19, 2016, "two substantively different contract drafts were being edited by two different people——one draft was a new contract, the other amended Mortimore's 2004 contract." Id. A cover letter was prepared by the head of the compensation committee for one of

36

the contracts——which contained no arbitration clause——but the cover letter and the contract were never sent nor signed. Id. The following day Merge Technologies decided to not offer Mortimore a new contract for a period and eventually decided to seek his resignation instead. Id., ¶8.

¶72 Based on these facts, the court of appeals held that Merge Technologies and Mortimore had, through "a process of negotiation," agreed to an amendment or modification to Mortimore's 2004 employment contract. Id., ¶19. The court of appeals relied on the adoption of the Commercial Arbitration Rules of the American Arbitration Association as a "clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court." Id., ¶20. This conclusion of the court of appeals however was based upon the fact that the "2004 contract contemplated that amendments or modifications, such as those negotiated between Mortimore and Merge [Technologies], would be enforceable and binding only if made in writing." Id., ¶19. Notably, despite this provision, "the record show[ed] that no such modifications or changes eliminating an arbitration requirement were ever made in writing." Id. The court of appeals concluded that Mortimore's "conten[tions] that this alleged oral agreement is enforceable . . . [and] his breach of contract claims are not subject to arbitration . . . is mistaken." Id., ¶18. Thus, Mortimore neither addresses nor concludes that once contracted for, there can never be "grounds as exist at law or in equity for the revocation of a contract." In the case at issue, unlike

37

Mortimore, there is a material factual dispute as to whether a second written contract, which does not have an arbitration clause, supersedes the first written contract which does, such that the determination of arbitrability here must first be decided by the circuit court rather than the arbitrator.

¶73 In sum, Cirilli and Mortimore do not stand for the proposition that once parties contract for arbitration, that decision is always irrevocable. Even in Mortimore, the circuit court was called upon to determine whether the initial contract had been revoked. See Mortimore, 344 Wis. 2d 459, ¶19. Clearly, section 788.01 of the Wisconsin Arbitration Act contemplates that a court will enforce "[a] provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract" and that such contractual provision to arbitrate "shall be valid, irrevocable and enforceable except upon such grounds as exist at law or in equity for the revocation of a contract." Wis. Stat. § 788.01. Another contract that clearly and expressly supersedes a first contract is "grounds as exist at law or in equity for the revocation of a contract." To the extent that language in Mortimore or Cirilli suggests that contracts to arbitrate are forever irrevocable, that language is limited by the facts of those cases.

¶74 Midwest and NEA also argue that Great Lakes and Dr. Pannu's challenge to the Operating Agreement is governed by Buckeye Check Cashing, 546 U.S. 440, and Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), and that those

38

cases require the enforcement of the Operating Agreement.[22] Midwest and NEA argue that this is so because the challenge is not itself to the arbitration provision, but instead hinges on whether the Redemption Agreement superseded the Operating Agreement. See Buckeye Check Cashing, 546 U.S. at 445-46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."); Prima Paint, 388 U.S. at 404 ("But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").

¶75 The challenges in Buckeye Check Cashing and Prima Paint, however, are also distinguishable from the challenge in

_____

[22] Midwest and NEA also allege that Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), explained that "before formation" and "after formation" challenges (words that Midwest and NEA used, not the Supreme Court) should be treated differently because not to do so would "permit[] a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." See Buckeye Check Cashing, 546 U.S. at 448–49. Midwest and NEA's argument completely lacks merit. Buckeye Check Cashing's explanation was in reference to why "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Id. at 449. It is unsurprising that Buckeye Check Cashing did not make a distinction between labels "before formation" and "after formation" as "it is not the mere labeling of a dispute . . . that determines whether an issue is arbitrable"; it is "whether the parties consented to arbitrate the dispute in question." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 304 n.11 (2010). Tellingly, if a court found a superseding agreement revoked the parties' consent to arbitrate, the court could not later find that the arbitration provision was enforceable.

this case. In both Buckeye Check Cashing and Prima Paint there was only one contract. Neither of the parties' challenges went to the subsequent contracting out of arbitration. In Buckeye Check Cashing, the parties resisting arbitration alleged that "the contract as a whole (including its arbitration provision) [was] rendered invalid by [a] usurious finance charge" that was in violation of various laws. 546 U.S. at 443-44. The parties, however, acknowledged that they "concluded" an agreement to arbitrate and never alleged that the finance charge impacted or revoked their consent to arbitrate. See id. at 444 n.1; Granite Rock Co., 561 U.S. at 300-01.

¶76 Similarly, in Prima Paint, the parties resisting arbitration alleged that the entire contract should be rescinded because they were fraudulently induced into entering the contract as whole, but "no claim [was] advanced by [the resisting party] that [the other party] fraudulently induced it to enter into the agreement to arbitrate." 388 U.S. at 398-99, 406. Here, however, Great Lakes and Dr. Pannu argue that the Redemption Agreement superseded the Operating Agreement. In fact, it is because of this genuine issue of material fact that we send this matter back for further determination. See, e.g., Joint Sch. Dist. No. 10, 78 Wis. 2d at 101 ("For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting United Steelworkers, 363 U.S. at 582)). Thus, neither Buckeye Check Cashing nor Prima Paint address nor prohibit

40

parties from subsequently contracting out of arbitration as the forum of dispute resolution.

¶77 Finally, fundamental principles of freedom to contract support the proposition that parties can subsequently contract to modify the terms of a previous contract. In fact, here, various parties in various capacities did contract in 2005 and 2006. Contracts can involve mutual agreement to change certain obligations, including a duty to arbitrate. Wisconsin law, including Wis. Stat. ch. 788, does not limit such freedom to contract, but rather chapter 788 reinforces the freedom of contract by enforcing parties' contractual agreements. In fact, this view comports with the Federal Arbitration Act if "grounds exist at law or in equity for the revocation of any contract" and places "arbitration agreements 'on equal footing with all other contracts.'" Kindred Nursing Ctrs., 137 S. Ct. at 1424; Wis. Stat. § 788.01; see, e.g., Sipple v. Zimmerman, 39 Wis. 2d 481, 492, 159 N.W.2d 706 (1968) ("The contract was legally binding unless mutually rescinded by the parties to it."); Town Bank, 330 Wis. 2d 340, ¶39 (describing the fact that "when [a] contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties" as a "principle [that] stems from basic contract law"). Courts should remain mindful of the limited role endowed to them under chapter 788 and not endeavor into the province of the parties' contractual choice to arbitrate.

41

¶78 The notion that no parties can ever contract out of arbitration is antithetical to these values and principles than the idea of a prohibition on contracting out of arbitration through mutual agreement and thus, a "limitless . . . contractual obligation to arbitrate." Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991); see id. ("[The United States Supreme Court] refuse[d] to apply [the] presumption [of arbitrability] wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate" and "determine[d] whether the parties agreed to arbitrate this dispute" because a court "cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement."). Neither Cirilli, Mortimore, Buckeye Check Cashing, nor Prima Paint require a competing result under these facts. Therefore, this court's conclusion that a party can subsequently contract out of the obligation to arbitrate is not only consistent with federal and Wisconsin law, it is also necessitated by the fundamental principles underlying freedom to contract.

## B. Summary Judgment

¶79 Finally, we briefly address why we remand this case to the circuit court. The principles of summary judgment are well-defined. Summary judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

42

is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2); Hirschhorn, 338 Wis. 2d 761, ¶20. Stated differently, summary judgment should not be granted "unless the facts presented conclusively show that the plaintiff's action has no merit and cannot be maintained." Mrozek v. Intra Fin. Corp., 2005 WI 73, ¶14, 281 Wis. 2d 448, 699 N.W.2d 54.

¶80 In determining whether to grant summary judgment, "the court decides whether there is a genuine issue of material fact; the court does not decide the fact." Racine Cty., 323 Wis. 2d 682, ¶25. The moving party bears the burden of establishing the absence of a genuine, that is, disputed, issue of material fact. AccuWeb, Inc. v. Foley & Lardner, 2008 WI 24, ¶21, 308 Wis. 2d 258, 746 N.W.2d 447; Grams v. Boss, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). Moreover, we view summary judgment materials in the light most favorable to the non-moving party. AccuWeb, 308 Wis. 2d 258, ¶21. A factual issue is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Baxter v. DNR, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991). A "material fact" is one that is "of consequence to the merits of the litigation." Michael R.B. v. State, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993). "Any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the moving party" for summary judgment. Heck & Paetow Claim Serv., Inc. v. Heck, 93 Wis. 2d 349, 356, 286 N.W.2d 831 (1980).

43

¶81 The question that was before the circuit court on summary judgment was whether the Redemption Agreement was a valid and enforceable contract. Competing affidavits were submitted which presented genuine issues of material fact.

¶82 Nonetheless, the circuit court granted summary judgment in favor of Great Lakes and Dr. Pannu concluding that the Redemption Agreement was validly formed. The circuit court found that Dr. Ahuja, through Midwest's attorney, made an offer that he intended to be bound by when the e-mail containing the "final agreement" was sent, and that Dr. Pannu accepted the offer when he signed the Redemption Agreement and returned it with the check that was subsequently cashed. Prior to granting summary judgment, however, the circuit court acknowledged that "maybe there[ are] some" factual disputes.

¶83 In this case, we conclude that the circuit court improperly granted summary judgment to Great Lakes and Dr. Pannu. In support of their competing motions, the parties presented affidavits attempting to demonstrate their mutual assent, or lack thereof, to forming the Redemption Agreement. See Wis. Stat. § 802.08(2) (precluding summary judgment if there is a "genuine issue as to any material fact" (emphasis added)).

¶84 In support of the position that the Redemption Agreement was validly formed and is enforceable, Dr. Pannu submitted an affidavit representing that Great Lakes and Dr. Pannu had performed all of their obligations under the Redemption Agreement other than moving out of their office by April 8, 2015, including delivering a check that was

44

subsequently cashed. That evidence, however, was refuted by Dr. Ahuja's affidavit. Dr. Ahuja asserted that the check was cashed in error by a clerical employee, and that a cashier's check in the same amount was sent to Dr. Pannu once the error was discovered. Further, Dr. Ahuja asserted that he had never agreed to the terms of the Redemption Agreement; had never instructed Midwest's attorney to include a complete release of Great Lakes' or Dr. Pannu's non-compete obligations in the Redemption Agreement, and in fact disagreed with releasing the restrictions; and that in April he told Dr. Pannu in a phone conversation about signing the Redemption Agreement that he was still reviewing it and shortly after the phone call determined that he was not willing to sign it. He noted that the agreement does not contain his signature.

¶85 At a minimum, these competing affidavits raise genuine issues of material fact rendering summary judgment improper. Hence, we reverse and remand the cause to the circuit court.

V. CONCLUSION

¶86 The crux of the issue before us concerns the circuit court's role in determining the proper forum of dispute resolution when a subsequent contract, if enforceable, does not contain an arbitration clause as is present in an initial contract. As a part of that analysis we consider whether a contract which contains a merger clause and which does not contain an arbitration clause can change the forum of dispute resolution when a prior agreement between the parties contains

45

an arbitration clause. The parties make competing arguments regarding a court's role in determining the applicability of this arbitration provision. They take contrary positions regarding whether all disputes, even arbitrability itself, must be submitted to arbitration. The parties present conflicting views of precedent regarding the judiciary's role in deciding motions to compel arbitration when a subsequent contract does not select arbitration as the forum for dispute resolution and does contain a merger clause which states that the subsequent agreement supersedes all prior contracts. Relatedly, the parties dispute whether all parties here can be compelled to arbitrate when arguably only one co-defendant is contractually required to arbitrate pursuant to the initial contract.

¶87 The claims in the underlying lawsuit that called upon the court to decide whether the dispute belonged in arbitration, involve whether Great Lakes and Dr. Pannu violated restrictive covenants in the Operating Agreement and the Ancillary Restrictive Covenant. The Redemption Agreement, however, does not contain an arbitration provision and in fact, purports to release those restrictive covenants. Therefore, which contract controls is seminal in the first instance as to whether arbitration should be ordered. Ultimately, regardless of forum, the controlling documents will also impact the underlying dispute itself.

¶88 The circuit court concluded on summary judgment that even though the initial agreement, here the Operating Agreement, required arbitration it was superseded by a later, valid and

enforceable Redemption Agreement which did not so require the parties to submit to arbitration. The court of appeals reversed and remanded with instructions to grant Midwest's motion to compel arbitration.

¶89 We reverse the court of appeals and conclude that the fundamental principles of freedom to contract allow parties to a previous contract to subsequently contract for a different forum of dispute resolution. Here, it is necessary that the circuit court initially determine whether the parties contracted to arbitrate. The court's authority to order arbitration is dependent on the terms of a contract. If the Redemption Agreement is the parties' contract, then the court lacks authority to order arbitration. Thus, the court must first ascertain which contract controls the forum of dispute resolution. In sum, we conclude that it is a court's duty to determine whether a contract calls for arbitration and when a dispute exists as to whether a second contract without an arbitration clause supersedes a first contract with such a clause, the determination of arbitrability must be decided in the first instance by the circuit court rather than the arbitrator.

¶90 We also conclude, however, that the cause must be remanded to the circuit court, not to compel arbitration as was ordered by the court of appeals, but rather, because the parties' competing affidavits submitted in support of their positions on summary judgment raised genuine issues of material fact concerning whether the Redemption Agreement is a valid

contract. Therefore, we reverse and remand to the circuit court for further proceedings.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶91 REBECCA FRANK DALLET, J., withdrew from participation.

¶92 SHIRLEY S. ABRAHAMSON, J. *(concurring).* There are two primary agreements in the instant case. The Operating Agreement says that all disputes will be submitted to arbitration and issues of substantive arbitrability will also be decided by the arbitrator. The Redemption Agreement purports to release Great Lakes and Pannu from any and all obligations imposed upon them by the Operating Agreement, including any agreement to arbitrate disputes.

¶93 The legal issues about which the parties disagree are the effect of the Redemption Agreement on the Operating Agreement and whether the Redemption Agreement is a valid contract.

¶94 I agree with the majority that, if valid, the Redemption Agreement releases Great Lakes and Pannu from the agreement to arbitrate contained in the Operating Agreement, and that the cause should be remanded to the circuit court to determine whether the Redemption Agreement is a valid contract.

¶95 However, I write separately because the majority fails to set forth a clear analytical framework through which the legal issues presented in the instant case should be resolved and mishandles federal case law in the process. Additionally, the majority stumbles in its application of the law to the facts in such a way that warrants both clarification and correction.

I

¶96 Although they are not binding on this court, several decisions by the federal circuit courts of appeals have

1

addressed the issue presented by the instant case.[1]  Of these cases, Dasher v. RBC Bank (USA), 745 F.3d 1111 (11th Cir. 2014), is the most helpful and worthy of special consideration.

¶97  In Dasher, Dasher sued the bank for allegedly charging excessive overdraft fees in breach of his 2008 account agreement.  The 2008 Agreement contained an arbitration clause. In 2012, a new account agreement was issued and Dasher accepted that agreement.  The 2012 Agreement did not contain an arbitration clause.  When the bank moved to compel arbitration per the 2008 Agreement's arbitration clause, an issue arose as to whether that clause was effective, given that the 2012 Agreement had superseded the 2008 Agreement.

¶98  The Dasher court rejected the bank's argument that an arbitration clause in an entirely superseded agreement remains effective unless specifically eliminated in the superseding agreement.  The Dasher court explained that "[d]espite [the language in the cases cited by RBC], which certainly appears to support RBC's contention, closer examination reveals a critical distinction:  in each case cited by RBC, the prior agreement remained effective to some extent for various reasons, whereas

---

[1] See, e.g., Dasher v. RBC Bank (USA), 745 F.3d 1111 (11th Cir. 2014); Dottore v. Huntington Nat'l Bank, No. 1:09-cv-2636, 2010 WL 3861010 (N.D. Ohio Sept. 28, 2010), aff'd, 480 Fed. Appx. 351 (6th Cir. 2012); Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522 (2d Cir. 2011); Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278 (2d Cir. 2005); Riley Mfg. Co., Inc. v. Anchor Glass Container Corp, 157 F.3d 775 (10th Cir. 1998); Patten Sec. Corp., Inc. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d Cir. 1987); Matterhorn, Inc. v. NCR Corp., 763 F.2d 866 (7th Cir. 1985).

here, the prior agreement is <u>entirely</u> superseded."[2] The cases cited by the bank could not stand for the proposition that arbitration clauses in <u>entirely</u> superseded agreements remain effective unless specifically eliminated because none of those cases dealt with an entirely superseded agreement.[3]

¶99 In my view, the <u>Dasher</u> case persuasively articulates the correct analytical framework.

¶100 Whether, and to what extent, a second contract supersedes a prior contract containing an arbitration clause such that the prior contract's arbitration clause is rendered ineffective is an issue that must be decided by the court rather than an arbitrator. The assertion that the prior contract's arbitration clause was superseded calls into question the enforceability of the arbitration clause <u>specifically</u>, including the agreement to arbitrate issues of substantive arbitrability.[4]

¶101 In determining whether, and to what extent, a subsequent contract supersedes a prior contract, the court "should apply ordinary state-law principles that govern the

---

[2] <u>Dasher</u>, 745 F.3d at 1120.

[3] <u>Id.</u>

[4] <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 444 & n.1 (2006) (stating that a party resisting arbitration may dispute that an agreement to arbitrate "ever concluded" or "challenge[] specifically the validity of the agreement to arbitrate"); <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 402-04 (1967); <u>see also</u> <u>Granite Rock Co. v. Int'l Bhd. of Teamsters</u>, 561 U.S. 287, 297-300 (2010).

3

formation of contracts."[5]  "If the subsequent agreement only partially supersedes the prior agreement, amends it, or waives some but not all of its provisions, the second question is whether the arbitration provision was among the superseded, amended, or waived provisions."[6]  If, however, the subsequent agreement <u>entirely</u> supersedes the prior agreement, the court should determine "whether the subsequent agreement <u>alone</u> supports a motion to compel arbitration."[7]

II

¶102 I now apply the relevant state-law principles that govern the formation of contracts.

¶103 The Wisconsin Arbitration Act provides, in pertinent part, that arbitration clauses "shall be valid, irrevocable and enforceable <u>except upon such grounds as exist at law or in equity for the revocation of any contract</u>."[8]  A subsequent contract that supersedes a prior contract constitutes "grounds as exist at law or in equity for the revocation of any contract."[9]  The question, then, is whether, and to what extent, the Redemption Agreement, the second contract, supersedes the Operating Agreement, the first contract.

---

[5] <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995)

[6] <u>Dasher</u>, 745 F.3d at 1122.

[7] <u>Id.</u> at 1123.

[8] Wis. Stat. § 788.01.

[9] Majority op., ¶47.

4

¶104 A subsequent agreement's supersession of a prior agreement is typically accomplished by including a merger clause in the subsequent agreement. In Wisconsin, this court stated the following with respect to merger clauses:

> [The appellant] argues . . . that an exception exists to the general rule that parol evidence is admissible with respect to the issue of integration; that evidence of contemporaneous or prior agreements, written or oral, which relate to the same subject matter as the agreement in question is not admissible when the written agreement embodies written terms excluding additional understandings or agreements not contained in the writing, i.e., 'merger' clauses. With this much we can agree. Absent claims of duress, fraud, or mutual mistake, a written provision which expressly negatives collateral or antecedent understandings makes the document a complete integration.[10]

¶105 A recent decision concerning merger clauses and supersession of contracts, Town Bank v. City Real Estate Development, LLC, 2010 WI 134, 330 Wis. 2d 340, 793 N.W.2d 476, is instructive in resolving the dispute in the instant case.

¶106 Town Bank involved a two-phase financing agreement between a bank and a developer for the purchase and redevelopment of a building in downtown Milwaukee. A Commitment Letter pledged financing for both phases of the project, but a subsequent Term Credit Agreement (TCA) executed by the parties provided financing for only the first phase. The TCA contained the following clause:

---

[10] Dairyland Equip. Leasing, Inc. v. Bohen, 94 Wis. 2d 600, 855-56, 288 N.W.2d 852 (1980); see also Matthew v. Am. Family Mut. Ins. Co., 54 Wis. 2d 336, 341-42, 195 N.W.2d 611 (1972).

5

This Agreement, including the Exhibits attached or referring to it, the Note and the Security Documents, are intended by Customer and Lender as a final expression of their agreement and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of their agreement except as set forth in this Agreement, the Note and the Security Documents.[11]

¶107 The bank provided the first phase of financing as provided by the TCA, but refused to finance the second phase as referenced in the Commitment Letter. The bank sued the developer seeking a declaratory judgment that the bank was not obligated to provide additional funding to the developer.

¶108 The Town Bank court concluded that because the TCA contained an unambiguous merger clause, quoted above, the developer was precluded from introducing any evidence of prior understandings or agreements that may have existed between the parties, including the Commitment Letter.[12]

¶109 Implicit in the court's holding was the conclusion that the TCA and Commitment Letter related to the same subject matter. That is, the Town Bank court (incorrectly, in my view) must have concluded that the TCA was the final expression of the parties' financing agreement altogether, as opposed to being the final expression of only the first phase of financing. Were this not the case, Town Bank would stand for the absurd proposition that a fully integrated contract with respect to one subject can extinguish contracts between the same parties with

---

[11] Town Bank v. City Real Estate Dev., LLC, 2010 WI 134, ¶14, 330 Wis. 2d 340, 793 N.W.2d 476.

[12] Id., ¶¶40-41.

6

respect to entirely unrelated subjects.[13] This is not, and has never been, how merger clauses operate in Wisconsin or elsewhere.[14]

¶110 Thus, with these state-law principles in mind, I turn to whether, and to what extent, the Redemption Agreement, if valid, supersedes the Operating Agreement.

### III

¶111 The majority suggests that, if valid, the Redemption Agreement supersedes the Operating Agreement in its entirety.[15] The Redemption Agreement does no such thing.

¶112 The merger clause in the Redemption Agreement states that the Redemption Agreement "constitutes the entire agreement between the parties pertaining to its subject matter and supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by [Great Lakes] or [Midwest]." (Emphasis added.)

¶113 Is the "subject matter" of the Redemption Agreement identical to the "subject matter" of the Operating Agreement such that the former entirely supersedes the latter? The answer is clearly, "No."

---

[13] Id., ¶¶68-72 & nn.10-13 (A.W. Bradley, J., dissenting).

[14] Dairyland, 94 Wis. 2d at 608-09; Matthew, 54 Wis. 2d at 341-42; 11 Richard A. Lord, Williston on Contracts § 33:14 (4th ed. 2002); Restatement (Second) of Contracts § 213.

[15] See majority op., ¶¶47, 56, 64, 67, 75.

7

¶114 The Operating Agreement's purpose is to provide "the rights, obligations, and restrictions" that will apply to Midwest and its Members. Within its scope are the subjects of capital contributions, tax distributions, allocations of profits and losses, the authority and powers of Midwest's officers and Members, etc. It is a document that governs the internal operations of Midwest. On the other hand, the Redemption Agreement's purpose is to "set forth the terms upon which [Great Lakes] will sell and [Midwest] will redeem [Great Lakes'] entire Membership Interest[.]" It does not purport in any way to alter or address the internal operations of Midwest and how those operations are to be governed.

¶115 Although there is some overlap in subject matter between the Operating Agreement and Redemption Agreement (e.g., how Great Lakes' Membership Interest is calculated and paid out), the subject matter of the agreements is not identical.

¶116 The Redemption Agreement, if valid, would not entirely revoke the Operating Agreement as the majority suggests.[16] Even if the Redemption Agreement is valid, the Operating Agreement will still have binding effect on Midwest and all of its Members even if it will no longer have any binding effect on Great Lakes or Pannu. Would Midwest lack a written agreement as to its

---

[16] At ¶¶59-60, the majority appears to read the merger clause in a way that is untethered to the subject matter of the Redemption Agreement. This suggestion gives further support to the absurd proposition that merger clauses have the effect of extinguishing prior agreements between the parties unrelated to the subject matter of the contract in which the merger clause is contained. See supra ¶108 and notes 13-14.

8

internal operations simply because it agreed to allow the voluntary dissociation of a Member and release that Member from obligations imposed by the Operating Agreement? I think not.

¶117 Indeed, we have an example of an <u>entirely</u> superseded contract in the instant case, namely, the 2002 Original Operating Agreement. Section 1.4 of the 2005 Operating Agreement states: "This Operating Agreement and the terms hereof supersede and replace the Original Agreement and its terms." There is no ambiguity——the 2005 Operating Agreement completely and entirely extinguished the terms of the 2002 Original Operating Agreement. If Midwest had intended the Redemption Agreement to <u>entirely</u> supersede the Operating Agreement, one would expect to see language similar to what Midwest used to entirely supersede the 2002 Original Operating Agreement.

¶118 Thus, if valid, the Redemption Agreement does not <u>entirely</u> supersede the Operating Agreement. However, that does not end the inquiry. The court must also determine if the Redemption Agreement supersedes the Operating Agreement <u>at all</u>, and if so, whether the Operating Agreement's arbitration clause is one of the superseded provisions.

¶119 The majority asserts that the Applicable Law provision of the Redemption Agreement expressly supersedes "the Operating Agreement's mode of adjudication, including its incorporation of JAMS Arbitration Rules that granted the authority to the arbitrator to determine arbitrability."[17]

_____

[17] Majority op., ¶64.

¶120 The majority's assertion incorrectly conflates choice-of-law provisions and arbitration clauses. Providing that questions concerning the construction of a contract shall be governed by Wisconsin law says nothing about the forum in which those questions will be decided.

¶121 The majority finally finds its footing when it reaches the Mutual Release provision of the Redemption Agreement. I agree with the majority that "[t]he obligation or promise to 'resolve any and all disputes arising with respect to the terms and conditions of this Operating Agreement . . . by arbitration' seemingly fits within this release."[18]

¶122 Asserting that a subsequent contract released the resisting party from its obligation to submit disputes to arbitration is exactly the type of specific challenge to the enforceability of a validly formed arbitration clause that the United States Supreme Court requires.[19] Great Lakes and Pannu do not argue that the arbitration clause in the Operating Agreement was invalidly formed. Rather, they argue that the arbitration clause in the Operating Agreement cannot be enforced because the

---

[18] _Id._, ¶61.

[19] _Buckeye_, 546 U.S. at 444 & n.1; _Prima Paint_, 388 U.S. at 402-04; _see also_ _Granite Rock_, 561 U.S. at 297-300.

10

Mutual Release provision specifically revokes any obligation on their part to submit to arbitration.[20]

IV

¶123 The majority's focus on the principles undergirding freedom of contract is not misplaced or inappropriate——those principles support the majority's conclusion that parties that agreed to arbitrate disputes may undo that agreement if they so choose. However, these principles alone do not provide a clear analytical framework through which the legal issue presented in the instant case should be resolved

¶124 I would articulate that framework as follows.

¶125 Whether, and to what extent, a second contract supersedes a prior contract containing an arbitration clause such that the prior contract's arbitration clause is rendered ineffective is an issue that must be decided by the court rather than an arbitrator. The assertion that the prior contract's arbitration clause was superseded calls into question the enforceability of the arbitration clause specifically, including the agreement to arbitrate issues of substantive arbitrability.

¶126 In determining whether, and to what extent, a subsequent contract supersedes a prior contract, the court

---

[20] Puzzlingly, the majority calls into question this framework. See majority op., ¶74 n.22. To be clear, Supreme Court precedent establishes two ways in which arbitration clauses may be challenged in and resolved by a court. The resisting party may dispute that an agreement to arbitrate "ever concluded," Buckeye, 546 U.S. at 444 n.1, or "challenge[] specifically the validity of the agreement to arbitrate" as Great Lakes and Pannu do in the instant case, Buckeye, 546 U.S. at 444-45.

should apply ordinary state-law principles that govern the formation of contracts. If the subsequent contract only partially supersedes the prior contract, amends it, or waives some but not all of its provisions, the second question is whether the arbitration provision was among the superseded, amended, or waived provisions. If, however, the subsequent contract entirely supersedes the prior contract, the court should determine whether the subsequent contract alone supports a motion to compel arbitration.

¶127 In the instant case, it appears that the purpose of the Redemption Agreement was not to nullify or extinguish the Operating Agreement in its entirety. Rather, the Redemption Agreement sets forth the terms upon which Great Lakes will cease to be a Member of Midwest and release Great Lakes and Pannu from any and all obligations that the Operating Agreement might have imposed upon them, including the obligation to submit disputes arising out of the Operating Agreement to arbitration and to allow the arbitrators to decide issues of substantive arbitrability.

¶128 However, there is a genuine issue of material fact with regard to whether the Redemption Agreement is a valid contract. Thus, the cause should be remanded to the circuit court for the determination of this issue.

¶129 REBECCA GRASSL BRADLEY, J. *(dissenting).* The majority nullifies the parties' arbitration agreement by creating a new rule bestowing on the judiciary the power to decide arbitrability even though the parties agreed an arbitrator would resolve this issue. Ironically, the majority invokes "fundamental principles of freedom to contract"[1] but nonetheless infringes on the contracting rights of private parties and expands the statutorily limited role of the courts when parties contract for arbitration. I would honor the parties' contractual agreement to let the arbitrator decide what, if any, impact the partially-executed Redemption Agreement had on the existence and validity of the Operating Agreement.

¶130 Because the parties dispute the formation of the Redemption Agreement as well as its effect on the continued existence of the Operating Agreement, this court must apply the rules the parties agreed to follow under their existing contract, for "any and all disputes arising with respect to the terms and conditions of this Operating Agreement." See Operating Agreement, § 13.7. The dispute here is whether the Redemption Agreement supersedes the Operating Agreement as to Great Lakes and Dr. Pannu, thereby eliminating the arbitration provision. This presents an issue of substantive arbitrability, which the parties contractually agreed to have the arbitrator decide. The majority acknowledges (albeit in a footnote) that "[t]he JAMS Arbitration Rules in the Operating

---

[1] Majority op., ¶5.

1

Agreement . . . require that even the issue of arbitrability be arbitrated"[2] but overrides the parties' chosen method of dispute resolution anyway.[3] I would instead respect the parties' contract, affirm the court of appeals, and remand the matter to the circuit court with directions to send the case to the arbitrator for resolution of this preliminary dispute.[4] I respectfully dissent.

---

[2] Majority op., ¶2 n.2. "JAMS" is an acronym for Judicial Arbitration and Mediation Services, Inc.

[3] While the foundation of the majority's preference for court resolution of arbitrability disputes is unclear, its disdain for arbitration as a method of dispute resolution is transparent in its declaration that "only those disputes that the parties have agreed to so submit to arbitration are relegated to proceed in that forum." Majority op., ¶43 (emphasis added). The majority misunderstands that the choice of method for dispute resolution belongs to the parties, not the court.

[4] The arbitrator would first decide arbitrability, which involves two inquiries: (1) "whether there is a construction of the arbitration clause that would cover the grievance on its face" and (2) "whether any other provision of the contract specifically excludes it." Joint Sch. Dist. No. 10 v. Jefferson Educ. Ass'n, 78 Wis. 2d 94, 111, 253 N.W.2d 536 (1977). In this case, no party challenges the applicability of the arbitration clause in and of itself; rather, Great Lakes and Dr. Pannu dispute its enforceability, alleging that a second contract eliminated the arbitration provision. If the arbitrator determines that the arbitration clause in the Operating Agreement no longer exists or is invalidated by the Redemption Agreement, this case returns to court for ultimate disposition of the underlying issue. If the arbitrator determines the Redemption Agreement was never formed, the non-compete issue would be resolved in an arbitration of the merits.

I

¶131 Principles governing arbitration disputes are rather straightforward and should have controlled the disposition of this case. First, Wis. Stat. § 788.01 (2015-16) recognizes that:

> A provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract, or out of the refusal to perform the whole or any part of the contract . . . shall be valid, irrevocable and enforceable except upon such grounds as exist at law or in equity for the revocation of any contract.

Wisconsin has a longstanding "policy of encouraging arbitration as an alternative to litigation," First Weber Grp., Inc. v. Synergy Real Estate Grp., LLC, 2015 WI 34, ¶24, 361 Wis. 2d 496, 860 N.W.2d 498 (quoted source omitted), and "[t]here is a strong presumption of arbitrability where the contract in question contains an arbitration clause," Cirilli v. Country Ins. & Fin. Servs., 2009 WI App 167, ¶14, 322 Wis. 2d 238, 776 N.W.2d 272.

¶132 Second, the circuit court generally decides arbitrability unless the parties contract to have the arbitrator decide it, as they have done here. See First Weber Grp., Inc., 361 Wis. 2d 496, ¶36. The arbitrability issue addresses whether the parties agreed to submit a dispute to arbitration. See Kimberly Area Sch. Dist. v. Zdanovec, 222 Wis. 2d 27, 37, 586 N.W.2d 41 (Ct. App. 1998). When parties "clearly and unmistakably" contract to have arbitrability decided by the arbitrator, the circuit court must honor the parties' choice. See AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 649 (1986). When the parties specifically incorporate the JAMS'

3

Arbitration Rules in their contract, the court views their inclusion as a clear and unmistakable agreement to remove the arbitrability determination from the circuit court and place it with the arbitrator. Mortimore v. Merge Techs., 2012 WI App 109, ¶20, 344 Wis. 2d 459, 824 N.W.2d 155; Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of [formal] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

¶133 Finally, as the majority recognizes,[5] Chapter 788 prescribes a limited role for the courts over arbitration proceedings, enumerating specific judicial powers. Notably absent from this narrow conferral of judicial authority is the power to remove decisions over arbitrability from the arbitrator when the parties contractually assigned that issue to the arbitrator alone.

II

¶134 Applying these rules, the answer is obvious: whether these parties will arbitrate their underlying dispute must be decided by the arbitrator. The Operating Agreement upon which Midwest bases its non-compete claim against Great Lakes and Dr. Pannu contains an arbitration clause, which plainly incorporates JAMS Arbitration Rules:

---

[5] Majority op., ¶46.

4

Section 13.7. <u>Arbitration</u>. With the exception of any decision made by Midwest pursuant to the terms of Section 5.5 hereof ["Appointment of and Powers of the Company President."] (which shall be deemed final), the parties hereto agree to resolve any and all disputes arising with respect to the terms and conditions of this Operating Agreement hereby by arbitration conducted by a single arbitrator selected from a slate of potential arbitrators residing in the Milwaukee, Madison or Chicago metropolitan areas, from a slate of five, proposed by JAMS. The party requesting arbitration shall strike the first name from the slate and the other party shall strike the next, alternating until a final individual remains, who shall serve as arbitrator and conduct an arbitration proceeding <u>in accordance with the Arbitration Rules of JAMS</u>. The arbitrator shall have the power to order temporary and permanent injunctive relief, on an expedited basis if deemed necessary. Any decision made by such an arbitrator within the scope of his or her authority shall be binding upon the parties. Unless agreed otherwise by the parties and arbitrator, the arbitration shall take place in Milwaukee County. <u>The arbitration shall be governed by the laws of the State of Wisconsin, this Operating Agreement and the JAMS' Arbitration Rules</u>[.]

(Emphasis added.) JAMS Rule 11(b) provides:

Jurisdictional and arbitrability disputes, <u>including disputes over the formation, existence, validity, interpretation or scope of the agreement</u> under which Arbitration is sought, <u>and who are proper Parties to the Arbitration</u>, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(Emphasis added.) Accordingly, the arbitration provision of the Operating Agreement evinces the parties' contractual agreement to have the arbitrator, rather than the circuit court, decide issues of arbitrability. The arbitration provision also requires "any and all disputes arising with respect to the terms and conditions of this Operating Agreement" be resolved in arbitration under JAMS rules.

5

¶135 Application of these rules under Wisconsin law easily resolves this preliminary issue. The parties entered into a contract with an arbitration clause, which incorporates JAMS Arbitration Rules. Those Rules confer exclusive authority on the arbitrator to decide issues of arbitrability. Controlling law holds that by doing so, the arbitrability question must be decided by the arbitrator——not the circuit court. The dispute about whether the Redemption Agreement was formed challenges the existence and validity of the Operating Agreement. JAMS Rule 11(b) controls and assigns authority to resolve this preliminary dispute to the arbitrator alone. Allegations that a partially-executed Redemption Agreement superseded the Operating Agreement do not alter the analysis.

¶136 The majority expresses concern that "serious questions exist as to whether the Operating Agreement still controls the issue of arbitrability, whether the Redemption Agreement supersedes that agreement, and to what extent, if any, one co-defendant, Dr. Pannu individually, ever agreed to arbitrate."[6] I agree. But the parties' contract specifies that the arbitrator, not a court, must answer these questions. The contract could not be clearer: "arbitrability disputes, <u>including disputes over the . . . existence, [and] validity . . . of the agreement</u> under which Arbitration is sought, <u>and who are proper Parties to the Arbitration</u>, shall be submitted to and ruled on by the Arbitrator." Great Lakes and Dr. Pannu challenge the existence

---

[6] Majority op., ¶54.

6

and validity of the Operating Agreement in light of the Redemption Agreement. The parties agreed the arbitrator would decide this issue. Dr. Pannu disputes being a proper party to the arbitration. The parties agreed the arbitrator would decide this issue too. Contrary to the majority's minimization of the arbitrator's authority to decide arbitrability as a mere "presumption,"[7] it is the parties' contract that requires arbitrability to be decided by the arbitrator. The court errs in interpreting Chapter 788 to require stripping the arbitrator of his contractual authority; nothing in Chapter 788 empowers the judiciary to override the parties' contracted method for resolving this precursory issue.

¶137 Contrary to the majority's misconstruction of the issue presented, this case is not about precluding parties from entering into subsequent agreements or altering the parties' preexisting choice of forum for dispute resolution. Certainly parties are free to change their minds and revoke, cancel, or otherwise invalidate the original agreement to arbitrate. But any decision to undo a contractual agreement to arbitrate must be mutual. If the parties did not dispute the formation of the Redemption Agreement or its applicability to each of them, the court may not be considering arbitration at all, given the unchallenged and fully executed Redemption Agreement with a merger clause. See Town Bank v. City Real Estate Dev., LLC, 2010 WI 134, 330 Wis. 2d 340, 793 N.W.2d 476. A merger clause

---

[7] Majority op., ¶54.

7

in a contract executed only by the party seeking to enforce that merger clause in order to evade a prior agreement to arbitrate does not have the same superseding effect when another party disputes its formation and application to all parties.[8]

¶138 This court has repeatedly protected parties' freedom to contract. Id., ¶33 (collecting cases). Our goal when interpreting contracts freely entered into by the parties "is to ascertain the true intentions of the parties as expressed by the contractual language." Id. (quoted source omitted). "[T]he best indication of the parties' intent is the language of the contract itself" and unless the contract is ambiguous, we stick to "the four corners of the contract, without consideration of extrinsic evidence." Id. (quoted source omitted). The only undisputed, freely-made contract before the court is the Operating Agreement and its plain language says the parties want "any and all" disputes about its existence or validity to be resolved by the arbitrator. I would honor the parties' contract by enforcing the arbitration provision in the Operating Agreement.

¶139 The majority opinion quotes "fundamental principles of freedom to contract" and acknowledges the "utmost liberty of contracting" and holds these rights "sacred,"[9] but then proceeds

---

[8] Not only do Midwest and NEA challenge the formation of the Redemption Agreement, they also dispute the applicability of its merger clause to NEA based on language restricting its scope to Dr. Pannu and Midwest.

[9] Majority op., ¶5, ¶39.

to disregard the plain text of the parties' Operating Agreement and to ignore well-established arbitration principles supporting freedom of contract rights. The majority invents a new procedure for circuit courts to follow when a party to an existing contract requiring arbitration contends the fully-executed first contract is void due to the parties' negotiations over a second contract, which one party signed but the other party refused to sign. This unprecedented judicial intrusion directs courts to ignore the contractual conferral of authority on the arbitrator to decide arbitrability, and instead conduct a full-blown court trial over the existence and validity of the fully-executed contract containing the arbitration clause. As a result, the parties who previously decided to resolve disputes out-of-court will be subjected to a circuit court calendar delaying any hope of resolving the merits of the non-compete allegations until a factfinder resolves this preliminary dispute in a forum the parties previously rejected in favor of private arbitration.

¶140 In reaching this result, the majority erroneously distinguishes and "clarifies," but does not overrule, the only two Wisconsin cases addressing similar factual scenarios: Cirilli, 322 Wis. 2d 238, and Mortimore, 344 Wis. 2d 459.

¶141 Cirilli involved a dispute between insurance agents and their former employer, Country Insurance. 322 Wis. 2d 238, ¶2. The Agents' written agreements with Country required binding arbitration for "any claim or controversy relating to or arising out of the relationship between the Agent and the

9

Companies." Id., ¶3. The Agents sued Country in circuit court claiming Country owed them termination commissions under the written agreements. Id., ¶2. Country filed a motion to compel arbitration of the Agents' claims. Id., ¶3. The Agents argued that a settlement agreement and release Country executed with different former agents making similar claims superseded the arbitration provision. Id., ¶5, ¶9. The Agents supported their argument with the decision of an arbitrator, in a prior case brought by different former agents, who determined the release voided the arbitration requirement. Id., ¶¶6-7. The circuit court agreed with the Agents' position and refused to order arbitration. Id., ¶8. The court of appeals reversed and ordered the matter sent to the arbitrator for determination. Id., ¶19. The court of appeals held the Agents' claims for termination commissions fell squarely within the agreement requiring arbitration and the fact that another arbitrator decided the release voided similarly situated agents' agreements with Country cannot be the basis for avoiding the Cirilli Agents' contractual language. Id., ¶¶15-18. The court of appeals ruled that by concluding the release controlled, the circuit court erroneously determined the merits of the Cirilli Agents' claims——a task assigned to the arbitrator, not the circuit court. Id.

¶142 Cirilli prohibits circuit courts from deciding the merits when the parties have agreed to arbitrate disputes, even when the answer is obvious and even when another arbitrator has already ruled on the merits of an identical claim involving

10

different claimants. Transferring a decision on the merits to the circuit court usurps the freedom of contract and the mutual decision two parties made to have disputes resolved by arbitration.

¶143 What constitutes the "merits" of a case can be unclear when one party argues a subsequent contract voided the obligations under the original contract. Typically, the merits will be the substantive allegation——here, Midwest's claim that Dr. Pannu violated his non-compete obligation goes to the "merits" of the dispute. However, the "merits" in this case also include a determination that a subsequent contract voids the existing contract because such a determination altogether eliminates the non-compete claim. By having the circuit court hold a trial whenever parties dispute the formation of a second contract (despite the existing contract's requirement that arbitrability be decided by the arbitrator), the majority disregards both the parties' contract and longstanding arbitration rules applied by both this court and the United States Supreme Court.[10]

---

[10] "[A] court is not to rule on the potential merits of the underlying claims" even if the claims appear frivolous. AT&T Tech., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 649-50 (1986). Courts "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." Id. Any doubts as to whether a claim should be arbitrated should be resolved in favor of arbitration. Id. at 650. "[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449 (2006).

11

¶144 In attempting to distinguish Cirilli, the majority ignores the fact that the Cirilli Agents argued the release——which did not contain an arbitration clause——superseded the underlying agreement between the parties, including its arbitration clause. This is the very issue presented in this case and the majority is simply wrong to state otherwise. Whether a subsequent agreement supersedes an earlier agreement containing an arbitration clause is a "question[] not properly before the court[.]" Cirilli, 322 Wis. 2d at 253, ¶18. In this case, whether the Redemption Agreement supersedes the Operating Agreement inquires into the existence and validity of the Operating Agreement, an issue the parties agreed the arbitrator must decide. The majority's interference with the arbitrator's exclusive province threatens the freedom to contract; it does not advance it.

¶145 In Mortimore, the court of appeals ordered arbitration in a factual scenario almost identical to Midwest's. Mortimore and his employer, Merge, had a written employment contract, which contained an arbitration clause for claims "'arising out of or relating to this Agreement.'" Mortimore, 344 Wis. 2d 459, ¶3. The arbitration clause incorporated American Arbitration Association ("AAA") rules, and required any amendments to the contract be "in writing and signed" by Merge. Id. Merge's Compensation Committee and Mortimore were working on a new contract for Mortimore and ostensibly reached an oral agreement on a contract that did not contain an arbitration clause. Id., ¶7. The new contract was never signed, however, because Merge

12

learned Mortimore had interfered with Merge's audit, and Mortimore subsequently resigned at Merge's request. Id., ¶8. Mortimore sued Merge in court for breach of contract and Merge requested the circuit court send the matter to arbitration. Id., ¶¶9-10. The circuit court held an evidentiary hearing and concluded the oral contract superseded the contract requiring arbitration. Id., ¶10.

¶146 The court of appeals reversed, ruling that the question of whether the unsigned second contract superseded the arbitration-requiring contract was a question for the arbitrator. Id., ¶21. The court of appeals held: (1) deciding the oral agreement trumped the existing employment contract is a determination on the merits that courts "do not make," id., ¶19 (citing AT&T Tech., 475 U.S. at 648-50); and (2) the parties unmistakably indicated they wanted the arbitrator to decide arbitrability as evidenced by the existing employment contract's adoption of AAA arbitration rules, including Rule 7(a): "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objection with respect to the existence, scope or validity of the arbitration agreement." Id., ¶20 (brackets in Mortimore).

¶147 Mortimore is on all fours with the facts in the current case. When parties have an existing contract with an arbitration clause indicating the parties want the arbitrator to decide arbitrability, whether a subsequent oral or partially executed agreement supersedes the existing contract is an issue the arbitrator must decide.

13

¶148 By favoring judicial resolution of the preliminary issue of arbitrability due to the mere possibility that a second contract might be valid, the majority ignores both the language of the Operating Agreement as well as longstanding arbitration principles. Because the parties dispute whether a second contract superseded the first, the plain text of the first contract, requiring that arbitrability be decided by the arbitrator, governs. The parties, who agreed to resolve "any and all disputes" by arbitration, should get the benefit of their bargain. Instead of honoring the parties' contract to arbitrate, the majority sets it aside.

¶149 The majority hollowly recites the pivotal precept that "[f]reedom of contract is based on the idea that individuals should have the power to govern their own affairs without interference,"[11] but nevertheless unseats the contractually-chosen arbitrator in favor of a judicially-imposed circuit court to resolve a dispute between parties who expressly rejected the court system as a forum for dispute resolution. Because I would enforce the parties' contractual expectations, I respectfully dissent.

---

[11] Majority op., ¶39 (quoting <u>Solowicz v. Forward Geneva Nat'l, LLC</u>, 2010 WI 20, ¶34, 323 Wis. 2d 556, 780 N.W.2d 111).

14